1          UNITED STATES DISTRICT COURT
            WESTERN DISTRICT OF TEXAS
2            SAN ANTONIO DIVISION

3 UNITED STATES OF AMERICA,    )
                        )
4      v.              )  Docket No. 5:17-CR-380-DAE
                        )
5 (1) CARLOS I. URESTI,      )  San Antonio, Texas
  (2) VERNON C. FARTHING, III, ) August 30, 2018
6                     )  10:03 a.m. to 11:07 a.m.
      Defendants.        )
7 _____)

8   TRANSCRIPT OF MOTION HEARING AND JURY TRIAL MATTERS HEARING
         BEFORE THE HONORABLE HENRY J. BEMPORAD
9           UNITED STATES MAGISTRATE JUDGE

10 A P P E A R A N C E S :

11 FOR THE GOVERNMENT:
      UNITED STATES ATTORNEY'S OFFICE
12     By:  Joseph Blackwell, Esquire
      By:  Sean O'Connell, Esquire
13     601 N.W. Loop 410, Suite 600
      San Antonio, TX  78216
14

15 FOR DEFENDANT URESTI:
      WATTS GUERRA, LLP
      By:  Mikal Watts, Esquire
16     Four Dominion Drive
      Building Three, Suite 100
17     San Antonio, TX  78257

18 FOR DEFENDANT FARTHING:
      GOLDSTEIN, GOLDSTEIN, HILLEY & ORR
19     By:  Gerald H. Goldstein, Esquire
      By:  Cynthia Hujar Orr, Esquire
20     By:  John Torrey Hunter, Esquire
      29th Floor, 310 S. St. Mary's Street
21     San Antonio, TX  78205-3199

22 COURT RECORDER:  FTR Gold

23 TRANSCRIBER:
      CHRIS POAGE
24     655 East Cesar E. Chavez Blvd., Suite G-65
      San Antonio, TX  78206
25     Telephone:  (210) 244-5036

1    (Open court at 10:03 a.m.)

2        THE COURT:  Calling the case of SA:17-CR-380,

3    defendant number two, United States of America versus Vernon

4    Farthing.  If I could have announcement of counsel, please.

5        MR. BLACKWELL:  Good morning, Your Honor.  Joe

6    Blackwell and Sean O'Connell here for the United States.

7        THE COURT:  All right.  Good morning.

8        MR. BLACKWELL:  Good morning, sir.

9        MR. HUNTER:  Good morning, Your Honor.  John Hunter,

10   Gerry Goldstein, Cynthia Orr for Mr. Farthing.

11       THE COURT:  All right.  Good morning to y'all as well.

12       MR. GOLDSTEIN:  Good morning, Your Honor.

13       THE COURT:  And I see that, though Mr. Uresti doesn't

14   have a hearing -- or a motion before the Court at this time, I

15   see that the senator is here, along with his counsel.

16     Mr. Watts, welcome.  I'm glad that you're here, because I

17   was hoping maybe, after this part of the hearing is complete,

18   to discuss jury selection in the case briefly with the parties

19   since we're all here.

20       MR. WATTS:  Absolutely.

21       THE COURT:  But I think it'd be better to go ahead and

22   start with this motion.  Then we can turn to that afterwards.

23       MS. ORR:  And, Your Honor, to advise the Court --

24       THE COURT:  Yeah.

25       MS. ORR:  -- Mr. Blackwell called our office, and

1   there's a couple of things that Mr. Goldstein and Mr. Blackwell

2   will want to put on the record as well --

3          THE COURT:  All right.

4          MS. ORR:  -- that's unrelated to --

5          THE COURT:  I'm happy to allow y'all to do that.

6   That's no problem.

7          MR. GOLDSTEIN:  Thank you.

8          THE COURT:  So we're here then on the motion that has

9   been referred to the Court, which is Mr. Farthing's motion for

10  bill of particulars, Docket Entry 73.  And I'll hear from the

11  defense.

12         MR. HUNTER:  Thank you, Your Honor.

13     As the Court is well aware, Judge Ezra has denied the

14  defense's motion to dismiss the indictment.  The government

15  maintains that this decision obviates a need for a bill of

16  particulars.  But to the contrary, I think it makes it all the

17  more important that we have additional specificity before we

18  proceed to trial.

19     The bribery statute is essentially a choose your own

20  adventure story.  It has a wide variety of variables that are

21  going to fit in any given particular case, that the government

22  is supposed to choose from in order to define the crime

23  sufficient for notice and due process.

24     For example, what agency of government are we talking

25  about, whether the offer was accepted, whether there was an

1  agreement to accept, whether there was a solicitation of an

2  offer or a demand for some sort of thing of value from a

3  specific person, whether the intent to act corruptly was done

4  with the intent to be influenced or, rather, with the intent to

5  be rewarded.  And lastly, whether it was done in connection

6  with a business, a transaction, a series of transactions,

7  et cetera.

8      In particular to this case, the problem we see is, that

9  it's not really clear from the face of the indictment whether

10  or not a *quid pro quo* is alleged.

11          THE COURT:  Can I stop you right there?

12          MR. HUNTER:  Yes, Your Honor.

13          THE COURT:  Because that's the -- as you know, I went

14  down this road pretty far on the request for disclosure of

15  grand jury materials.  And ultimately that was decided on

16  another issue, the secrecy of grand jury.  But we had a pretty

17  lengthy conversation between the parties about this issue of

18  whether this is a gratuities indictment or whether this is a

19  bribery indictment.

20          MR. HUNTER:  Correct.

21          THE COURT:  Can you tell me what your view of

22  Judge Ezra's ruling denying the motion to dismiss the

23  indictment, because it talks at length about that issue.  And I

24  will be frank with the parties.  I'm not going to reconsider

25  anything that the judge has already decided.  So you'll have to

1  tell me why that discussion leaves something open for the bill

2  of particulars with regard to this issue.

3         MR. HUNTER:  Yes, Your Honor.  I think it creates

4  several issues that need attention here.  The first is, as

5  Judge Ezra notices and acknowledges in his decision, there is a

6  split of authority, a lack of unanimity among the circuits

7  about whether or not 666 covers gratuities at all.  This

8  circuit is generally, I think, believing in the direction that

9  it is covered, although I don't believe there's a specific

10  opinion from the Fifth Circuit to that effect.

11         THE COURT:  Okay.  I have to stop you again.  Didn't

12  Judge Ezra -- he says he's going with the majority based on the

13  language of the -- of the statute.

14         MR. HUNTER:  Correct, Your Honor.

15         THE COURT:  And even if you disagree with that, of

16  course, you have the right to preserve that issue, but why

17  would I be ruling differently than the judge on that matter?

18         MR. HUNTER:  Well, we don't ask you to --

19         THE COURT:  All right.  Very well.

20         MR. HUNTER:  -- at all reconsider what Judge Ezra has

21  previously done.  While we take exception to Judge Ezra's

22  ruling, we recognize that that is going to be the law of the

23  case in this trial.

24     But we have an obligation to preserve.  And we --

25         THE COURT:  Sure.

1       MR. HUNTER:  -- want this issue to be considered by

2  the Fifth Circuit and by the Supreme Court, if necessary.

3       So in order to effectuate that, the first question is, is

4  this the case that is going to decide that question?  And

5  only -- that would only be the case if there is a gratuity-

6  based theory that the government is relying upon.

7       As the indictment presently reads, it is not clear whether

8  it is a gratuity or not.  Judge Ezra does say that he finds

9  that there is sufficient allegation in the indictment to infer

10 a *quid pro quo*.  And that, I think, doesn't necessarily

11 foreclose the inquiry, though, because there's still enough

12 room in that indictment for the government to come in at trial

13 and say, Look, folks, you don't need to have a *quid pro quo* to

14 complete this crime.  It could have been an illegal gratuity.

15 And so you can convict if that was the understanding, that this

16 was to be a reward for an action that Judge Galindo would have

17 taken anyway.

18      And if that is a temptation the government encounters --

19 and it very well could encounter it.  The evidence in this case

20 is such that they may not be able to satisfy a *quid pro quo*.

21 We need to be able to either prepare to defend against a

22 gratuity, or we need to know that the government will live or

23 die with their allegation that a *quid pro quo* occurred.

24      And we have that problem for a couple of different reasons.

25 The first is the indictment may generally lay out that a *quid*

*pro quo* existed in this case, but what that *quid pro quo* is is
not clear at all.

For example, in Judge Galindo's debrief with the government
Judge Galindo claims that the *quid pro quo* was, in essence --
pardon me one second, Your Honor.  In his 302 he's claiming
that the *quid pro quo* was, in essence, that he would -- he
attended a public hearing on BOP procedure; that the bidding
price was $7; and that he advised the Farthings well in advance
of this August meeting in 2006 that if they bid six or lower,
they should get the contract.  That's the first claim of *quid
pro quo*.

But that isn't how it was presented to the grand jury.  In
the grand jury proceedings we see them telling the grand jurors
that in legal terms the *quid pro quo* was whether or not you did
it in terms favorable to PNA and not to the people of Reeves
County who he represented; that he negotiated a lower -- that
if they negotiated a lower payment to PNA in the contract, that
would have been money that would have gone to the people of
Reeves County.  Basically that the *quid pro quo* was he would
refrain from negotiating it.  That's a distinct thing from --

THE COURT:  Can I ask you a technical -- or a
discovery question --

MR. HUNTER:  Yes.

THE COURT:  -- before you go -- you mentioned Judge
Galindo's statement in the 302.  I'm assuming that's an FBI 302

1  report from the agent.

2       MR. HUNTER:  Yes, Your Honor.

3       THE COURT:  So it's actually's the agent's statement,

4  not Galindo -- the judge's statement?

5       MR. HUNTER:  That's correct.  It's a hearsay --

6       THE COURT:  And it's reflected in it.

7     Did the judge testify, to your knowledge, at the grand

8  jury?  Was there grand jury testimony from the judge?  I don't

9  --

10       MR. HUNTER:  Not to my knowledge, Your Honor.

11       THE COURT:  Okay.  So what they had was agent

12  testimony, I think it was Agent Giese's testimony, to the grand

13  jury.  And that's how it would have been related?

14       MR. HUNTER:  Right.  So what we're talking about are

15  --

16       THE COURT:  All right.  Very well.  I just wanted to

17  make sure I knew what we were talking about in terms of the

18  discovery.  But go ahead.

19       MR. HUNTER:  I apologize.  Yes.  That is --

20       THE COURT:  No, no, no, no.  You were -- you were

21  clear.  It was me who didn't understand.

22       MR. HUNTER:  That is -- that is the issue.  We have

23  one government agent telling us that the *quid pro quo* was a

24  specific recommendation as to a price quote, another indication

25  that the *quid pro quo* was just generally a failure to

1  negotiate.  So we have a lot of problems there.

2      We also have to deal with the fact that we're talking about

3  a very long timeline of events.  Galindo describes these things

4  not happening in any contemporaneous fashion.  And I don't

5  think that we have evidence that would plainly show a

6  smoke-filled room where all of the different components and

7  elements of this were agreed upon in one sitting.  But rather,

8  we're talking about a string of conversations spanning before

9  and after it was clear that Reeves County was going to get this

10  contract and spanning before and after the vote that finalized

11  the agreement.

12      And I apologize.  In Galindo's first interview he said

13  there was no *quid pro quo*.  So we have a lot of conflicting

14  pieces of evidence to deal with.  We're not going to be able to

15  draw a lot from the discovery that's available to ascertain

16  what their theory of *quid pro quo* is.

17      Now, it's a cooperating defendant.  Mr. Galindo has pleaded

18  guilty.  He's heavily referenced in the indictment.  His

19  version of events is the government's version of events.  They

20  should know what their theory of *quid pro quo* is, if it exists.

21          THE COURT:  Let me -- I just have to press you on

22  that.  That's -- the things that you're describing to me is

23  just the sorts of things that a defense uses to prepare their

24  defense.  It's like you get on the stand, and he says, Oh, we

25  did this.

1    You say, Yeah, you did that.  But a long time ago you said

2    the exact opposite.  And then you said there was no *quid pro*

3    *quo*.  Jury, don't believe this guy.  He keeps changing his

4    story.

5        That's what preparing a defense is, as I understand it.

6    Unless you have -- unless there's like some -- that's why I was

7    asking about the grand jury question.  If there's some secret

8    evidence that y'all haven't been provided yet, I need to know.

9    They may not be required to, but I would like to know about

10   that because that would then have an issue.

11       But it sounds like you've got a basis upon which to

12   challenge some of the things that are in the indictment as to

13   the statements made by Judge Galindo.

14       MR. HUNTER:  Well, yes.  But we need -- we need there

15   to be a line of demarcation; that if we cross it, we actually

16   win; that there would be a point at which we could say to this

17   this jury, They have failed to prove to you this element of the

18   offense beyond a reasonable doubt.  Your only verdict must be

19   acquittal.

20       But we can't do that because the government has an escape

21   hatch.  They get to run through the trial, arguing *quid pro*

22   *quo*, explaining why Judge Galindo was mistaken or he was

23   minimizing or whatever their excuses are going to be.  And if

24   they realize that the jury's not buying it, they get to say,

25   Folks, you don't have to have a *quid pro quo*.  It could be

gratuity.  All it has to be is a reward.  It could have all
been formulated after the fact, after Galindo left the office.
You don't have to worry about that.

THE COURT:  All right.

MR. HUNTER:  And so if, in fact, 666 covers both
bribes and gratuities, as this Court has held and as the
majority view states, then we need to have a solid commitment
from the government which theory this is, because we cannot
tell it from the face of the indictment.

THE COURT:  All right.

MR. HUNTER:  That's, I think, the most glaring problem
that we have.  Everything in our motion for bill of particulars
functionally stems from that concern and the accompanying
concern.  For example, we don't have to necessarily just think
of it in terms of *quid pro quo*.  We can also think about it in
terms of official act.  What is the exact official act that
Galindo is said to have done?  It's not clear from the
indictment what that is.

What we do know is, we have these conflicting accounts.
Maybe it's a specific recommendation.  Well, if it is a
specific recommendation as to a price, was that something that
was part of his official capacity to even know or understand?
Is it -- does it constitute the type of inside knowledge he
would be obligated not to disclose?

If it's about failing to negotiate, what was his duty, as

1    the commissioners court judge, to actually negotiate?  And how

2    much negotiation is proper?  These are all questions we can't

3    answer if we don't know the actual official act in question.

4            THE COURT:  The idea being, I guess, if it's *quid pro*

5    *quo*, then it would be different in the sense that he would have

6    to have done something he otherwise would not have done.

7    Whereas, if it's a gratuity, whatever the scope of his acts,

8    even if he acted legally, could be paid off for it?

9            MR. HUNTER:  Exactly.

10           THE COURT:  Okay.

11           MR. HUNTER:  And that's, I think, a major concern.

12           THE COURT:  All right.  Well, then here comes my

13   question.  And this is the same question I have for

14   Mr. Blackwell.  And then I'm happy to hear any other argument

15   you would like to make.

16       On Page 3 of the indictment, paragraph 11, there's a single

17   paragraph that says, This is the object of the conspiracy.  And

18   that seems like a pretty binding thing to say, This is the

19   object of the conspiracy.

20       And it says, The object of this conspiracy is soliciting

21   and accepting payments, things of value, from Farthing,

22   Farthing's company and its successor companies in exchange for

23   favorable official action.

24       And then it says, And to hide and cover up the conspiracy.

25   That sounds more to me -- that's not gratuity.  That's more

1  like money laundering.  But in exchange for favorable action,

2  that sounds a lot like *quid pro quo* to me.

3          MR. HUNTER:  Well --

4          THE COURT:  In exchange -- that's what *quid pro quo*

5  means to my understanding, something in exchange for something

6  else.  Why can't you hold them to that object?  And if they try

7  to prove a different object at trial, then you would do what

8  Ms. Orr was arguing to me the last time we were here, saying,

9  Wait a minute.  This is a Stirone problem.  This is a

10 constructive indictment.  This indictment needs -- this

11 issue -- something other than "in exchange for," that's got to

12 be presented to the grand jury.  It hasn't been.  We move to

13 dismiss.

14   Why wouldn't that be your remedy here?

15         MR. HUNTER:  Well, I think, again, it's just too

16 nebulous of a description.  In exchange for an official act,

17 but what official act are we talking about?

18         THE COURT:  No.  You're jumping out of a different

19 issue.  Hold with me on the *quid pro quo*, and then we can talk

20 about the official act.  On the *quid pro quo*, in exchange for,

21 doesn't that mean *quid pro quo*?  Doesn't that mean it has to be

22 bribery, because a gratuity for any official act, legal or

23 illegal, is not *quid pro quo*.  That's my question.

24         MR. HUNTER:  Well, if in fact --

25         THE COURT:  But I'm happy to hear from Mr. Goldstein

1　or Ms. Orr if they have something.

2　　　　MR. HUNTER:  Well --

3　　　　MR. GOLDSTEIN:  Unfortunately, you've caught me

4　[inaudible], Your Honor.

5　　　　THE COURT:  Okay.  You see my concern?

6　　　　MR. HUNTER:  That is -- I think that is a fair

7　concern.

8　　　　THE COURT:  I'm going to ask your colleagues across --

9　on the other side the exact same question.

10　　　　MR. HUNTER:  Well, and the government can correct me

11　if I'm wrong.  Ms. Orr is calling to mind that at the last

12　hearing we had in front of Your Honor on this question the

13　government indicated that they were perfectly capable of

14　proceeding on both theories in the same indictment.  And that

15　is the issue, is that --

16　　　　THE COURT:  That's why I was going to ask them, too.

17　Yeah, exactly.

18　　　　MR. HUNTER:  -- is that -- is that we can't have that,

19　because they will always have that escape hatch as a result.

20　　　　THE COURT:  All right.

21　　　　MR. HUNTER:  If the government wants to come forward

22　and say, Yes, definitively this is a *quid pro quo* case, it is a

23　bribery case, that is our theory, then that satisfies a large

24　amount of our concern in the bill of particulars, although it

25　does not satisfy the secondary concern, which is if that is --

1    if that allegation is the crux of it, what is the official act?

2         And as I see it, it could be any of Mr. Galindo's previous

3    accounts for it.  There certainly is also a theory that it's

4    some kind of a string of official acts.  It could be like a cop

5    on the payroll-type theory.

6         But they need to give us a little bit more specificity of

7    that because the bulk of the indictment is setting up each of

8    the individual pieces of what could be a finalized conspiracy

9    to bribe.  But it's over a span of months and years.  And we're

10   not having all of this coalesce at once.

11        And so it very well could be that the final understanding

12   is different from the understanding at any given particular

13   moment, which leads me to another concern I think we have in

14   the bill of particulars, which is when does this conspiracy

15   end?  And I think that -- Judge Ezra has denied our motion to

16   dismiss on the limitations issue.  But we have to recognize

17   that all of the substantive acts that formed this

18   understanding, this arrangement, this plan -- and we're going

19   to for the moment assume it is a *quid pro quo* plan because I

20   hope the government will entertain our invitation on that.

21        If that is how it was set up, then this offense is barred

22   by limitations.  Its only saving grace would be that it's a

23   continuing offense because it's a conspiracy, and that one of

24   its objectives was to cover up.  That's about it.

25        But, Your Honor, at a certain point the conspiracy's

1  objectives are obtained.  How long is this thing going to run

2  on?  How many $5,000 payments is Mr. Galindo going to receive

3  for what appears to be a solitary act of forbearance on one

4  occasion, on one vote, for a single contract.

5          THE COURT:  Well, I mean, I could assume you keep --

6  let me just ask.  It seems like -- I could assume you could

7  keep on getting payments.  As long as Farthing's company's

8  getting paid, he's going to get paid.  That's the deal.  And so

9  that means as long as the payments are going, the conspiracy's

10  still going on.

11         MR. HUNTER:  Well --

12         THE COURT:  Why wouldn't that be the -- why -- I mean,

13  that sounds like a conspiracy.  You don't have to promise to

14  pay right now.  You make the conspiracy.  You make the

15  agreement.  It goes as long as you keep getting payments.

16         MR. HUNTER:  Well, for one, we have --

17         THE COURT:  If it's the *quid pro quo*.

18         MR. HUNTER:  For one, we have a change of companies.

19         THE COURT:  Yes.  Go ahead.

20         MR. HUNTER:  And Mr. Farthing ceases to be involved in

21  this operation at a given point.  That's one factor.

22     What I'm saying is, we're going to get to a place in trial

23  where the counting of conspiracies is going to be important.

24  And we may have an argument to be made that the conspiracy that

25  was alleged ceased and that that could be a question of

1  limitations that the jury gets to decide.

2       THE COURT:  I see.  All right.

3       MR. HUNTER:  But if we don't have a more fixed concept

4  of this, on -- going back to *quid pro quo*, going back to

5  whether it's a bribe or a gratuity, going back to what the

6  official act was, we're not going to be able to firmly

7  ascertain when the objectives of the conspiracy were met apart

8  from the *de minimis* allegation that it was continuing.

9       I mean, it is -- it's never ceased to boggle my imagination

10 that the government can take what would otherwise be a

11 limitations-barred offense.  And by adding those very small

12 magic words and the numbers 371 next to it, they can keep it

13 running for perpetuity.

14      But since that seems to be the law and that seems to be

15 something that they can get away with, we at least should have

16 an opportunity to put to the jury the question of whether or

17 not they believe beyond a reasonable doubt it's a continued

18 offense.  And we have to have a defined set of terms about what

19 the offense is, when it happened, when it was consummated and

20 when its objectives were complete, apart from cover up.

21      THE COURT:  One more question for you with regard to

22 that.  One of the things in your bill of particulars is to

23 request a whole series of which overt acts show which action?

24 With regard to that, I think we settled at the last hearing

25 there wasn't any dispute that, in fact, different overt acts

1  can be presented at trial than are presented here.

2      So even if you got a bill of particulars that laid all that

3  out, the government is complete with -- as I understand it,

4  completely within their rights to say, You know what?  Here's

5  some more overt acts.

6          MR. HUNTER:  I think --

7          THE COURT:  So how -- why would -- I mean, doesn't

8  seem to me that an overt act bill of particulars is appropriate

9  when you can -- when you're not required -- you're not bound by

10  the ones you have or you could add other ones.

11          MR. HUNTER:  If we had a more definite understanding

12  of what the official act and objective were, then I don't think

13  there would be as much of a problem about which official -- or

14  which overt acts are alleged or how many.  I think they could

15  list a long litany.  A bribe for a particular act in Congress,

16  for example, to be done, it may take many months, many

17  phonecalls, many payments in order to effectuate its objective.

18      But there has to be some clear idea of what are we

19  ultimately trying to accomplish.  A lot of this talk, a lot of

20  this information in the grand jury transcript and in Galindo's

21  302, they come across as just sort of a general soured

22  corruption, someone who is just kind of going along to get

23  along.  You know, maybe I need something under the table on

24  this.

25      But that's not going to -- that's not going to get us there

unless we fully understand what he has to give in exchange,
because that's really not clear from the indictment.  What
is -- what is Galindo giving Mr. Farthing?  What is the actual
benefit that's received?

Let's say he presided over the vote.  Okay?  He certainly
wasn't the only vote.  There's -- I mean, to what extent is it
actual or perceived?  I mean, is impossibility a potential
defense that could be raised here?  I don't know because I
don't know what official act it's claimed that we specifically
were paying him to do.

THE COURT:  I mean, isn't it all in 12(b)?  I don't
think there's anything else that he did except in 12(b) of the
indictment, right?  In exchange -- in exchange for -- again,
the thing -- for payments and promises of future payments,
acting in his official capacity, Galindo presided over the vote
and helped Farthing's company negotiate price and secure the
R-3 contract in terms favorable to his company.

That's what he did.  I mean, if he did -- I mean, again,
maybe they could argue some overt act, them doing something
else, but he says they -- it was -- the object was in exchange
for favorable conduct.  And then it says that -- and I think
that's the only place that he says he did anything in the
indictment, unless, of course, I missed something in that -- in
that --

MR. HUNTER:  You haven't, Your Honor.  But I think

1    that enumerates it perfectly.  If those are the official

2    acts -- and I think those are fairly vague official acts.

3              THE COURT:  Yeah.  All right.

4              MR. HUNTER:  I mean, I'm going to help you get a

5    contract.  All right.  Well, God only knows what that means.

6    But if that is going to be an acceptable overt act, I mean --

7    or, rather, official act, then we need to have notice of what

8    overt acts were done specific to that official action.

9              THE COURT:  All right.

10             MR. HUNTER:  And we're not going to get that at

11   present.  So, I mean, I think it can be either/or.  The

12   government could tell us with more specificity what Galindo did

13   to make this contract obtainable, or they can tell us what

14   Farthing and Uresti did to more definitively secure Galindo's

15   cooperation.

16             THE COURT:  Well, so let me say, you've done a very

17   good job arguing this, with a lot of interruptions from your

18   co-counsel.  So if there's something else that you need to add,

19   I'm happy to hear it, or if co-counsel needs to say something

20   else before then I hear from Mr. Blackwell.

21             MR. HUNTER:  Yes, Your Honor.  I think Ms. Orr has

22   something.

23             MS. ORR:  A couple of things I wanted to say, Your

24   Honor.  And that was that --

25             THE COURT:  I'll let both sides argue.  You might as

1  well just get it all out.

2         MR. BLACKWELL:  It's fine, Your Honor.  We don't -- we

3  don't --

4         MS. ORR:  I just wanted to --

5         THE COURT:  All right.  Very well.  Just checking with

6  you guys.

7         MS. ORR:  -- just wanted to remind the Court that

8  there was one bidder in this contract.

9         THE COURT:  "There was one"?  I'm sorry.

10        MS. ORR:  One bidder.

11        THE COURT:  Oh, okay.

12        MS. ORR:  A sole bidder.

13        THE COURT:  Okay.

14        MS. ORR:  That's what makes it somewhat mysterious

15 about what it is that Judge Galindo did that somehow assisted

16 PNA in getting the bid.

17     And the other thing I wanted to say is that the impeachment

18 of Galindo, I guess, could be characterized in some way as a

19 defense.  But it's not -- I think we need sufficient overt acts

20 so that we can prepare a defense.  So, for example, if the

21 government were to say that we have -- you know, this

22 particular amount was agreed upon on this particular day or

23 after this meeting, and if, in fact, the contract had already

24 been agreed to by BOP at that time, then we would know, well,

25 that -- we've got a good defense against that, or my client

1  wasn't at that meeting or -- you know, so it's really wanting

2  to put on a real substantive defense that we need the bill of

3  particulars to help us with as well.

4          THE COURT:  All right.  Very well.

5      All right.  Mr. Goldstein, anything else that you wanted to

6  add before I get to hear from the other side?

7          MR. GOLDSTEIN:  Out of respect for the able argument I

8  just heard and able counsel for the government and particularly

9  for the Court, I'll abstain.

10         THE COURT:  All right.  Very well.

11     Mr. Blackwell, let me hear from you or Mr. O'Connell.  And,

12  again, I'm quite happy to hear from both of y'all if you

13  believe it's appropriate.  You know what?  I'm trying to get to

14  the bottom of it.  I'm happy --

15         MR. BLACKWELL:  It's fine, Your Honor.

16         THE COURT:  All right.

17         MR. BLACKWELL:  You're just going to hear from me.

18         THE COURT:  All right.

19         MR. BLACKWELL:  But we have -- we have -- we have no

20  objections to any of that.

21         THE COURT:  All right.  Very well.

22         MR. BLACKWELL:  That's completely fine.

23     Your Honor, just as a matter -- bill of particular's not

24  used for discovery mechanism, which is basically everything

25  that they've argued -- is to try to use it as a discovery

1    mechanism.  It's not the purpose -- there's a specific case

2    that say a bill of particular's not to be used to discover

3    overt acts.  That law is firmly established, which is what they

4    basically just argued.

5        In terms of legal theories, overt -- bill of particulars

6    are not to be used to discover legal theories, which is -- the

7    crux of their argument is which legal theory that the

8    United States is presenting under.  And the answer is both.

9    Both are -- both are charged in the indictment, Your Honor.

10   And I -- and I guess we'll just cut through what --

11           THE COURT:  Because they -- I noted that the

12   indictment -- as Judge Ezra did, that the indictment, I believe

13   paragraph 10, does cite both -- the statutory language from

14   both elements.  But that object, it sounded to me like in

15   exchange for --

16           MR. BLACKWELL:  And I understand in terms of the

17   object.  But you've got to look at the overall charge, Your

18   Honor.  And that's going up into the conspiracy, which is --

19   you know, one thing that they highlighted in their motion,

20   which I know they didn't argue now, and so I'm not going to

21   hold them to it, is they think the difference between a

22   gratuity and a bribery is the timing of the payment, which is

23   not --

24           THE COURT:  The Court's resolved that.

25           MR. BLACKWELL:  The Court --

1     THE COURT:  It's the intent -- it's the intent to make

2  them -- to get them to do this or to reward them for doing it.

3     MR. BLACKWELL:  That's exactly right.

4     THE COURT:  Very well.

5     MR. BLACKWELL:  And you can have a reward in exchange

6  for action taken.

7     THE COURT:  Yes.

8     MR. BLACKWELL:  So that's why you have things -- I

9  mean, the Court has already dealt with their argument about

10  constructive amendment.  And that's why you have a unanimity of

11  theory.  And the statute allows for charging for multiple

12  criminal acts under the statute.

13     We do not have to elect.  We can present the evidence to

14  the jury, and the jury can decide which criminal act has been

15  violated by the actions of the evidence that we present.  And

16  that's really the crux of what their argument is, is, you know,

17  trying to get the government to A) give a legal -- very

18  detailed exposition of its legal theories, which I would even

19  argue this is not just a boilerplate indictment.  It is a

20  speaking indictment.  It lays things out with specificity,

21  which Judge Ezra identified.  In fact, he called it a detailed

22  indictment in his order.

23     And so the purpose of the bill of particulars and what they

24  claim that they need a bill of particulars for in their motion

25  is, one, to prevent against double jeopardy, which the district

1  court has already decided --

2          THE COURT:  Yeah.  I'm not -- okay.  Look, I can slow

3  that part down.

4          MR. BLACKWELL:  Sure.

5          THE COURT:  This isn't the sufficiency of the

6  indictment.  It isn't a due process claim at this stage.  It is

7  the Sixth Amendment right to apprize them of their defense to

8  avoid substantial prejudice.  That's the issue that the Court's

9  addressing, because the motion -- the order dismissing --

10 denying the motion to dismiss the indictment deals with the

11 question of whether the indictment is sufficient, whether the

12 grand jury returned the proper indictment, matters like that.

13         MR. BLACKWELL:  But the Court --

14         THE COURT:  But that -- so it's just the

15 defense question in my mind.

16         MR. BLACKWELL:  But, Your Honor, in that -- in that

17 order the Court also said there's sufficient information to

18 provide -- to prevent undue surprise in the preparation of

19 their defense.  So I would argue that that issue's been taken

20 care of already by the Court's order.

21    But the long and short of it is what they're trying to get

22 is to say the United States has to pick.  The United States --

23 which would -- if that were the case, then that would do away

24 with the entire body of law that allows the United States to

25 plead conjunctively and to prove disjunctively.

1    If we had to elect prior to trial, then that would be -- we

2  wouldn't be able to do that anymore.  There would be no need

3  for unanimity of theory instruction and things like that.  We

4  are allowed to proceed under different legal theories.  It's

5  charged.

6    The statute criminalizes certain actions, whether you

7  are -- you know, solicit, demand, receive, intended to be

8  influenced or rewarded.  Okay.  That's -- you know, influenced,

9  rewarded, those are two ways that you can violate the statute.

10  Bribery, gratuity, okay, in kind of short terms.

11    Both of them are charged in this indictment, Your Honor,

12  under the -- under the language that we track the statute.  And

13  they want the United States to have to say that we're basically

14  abandoning one element of that -- one aspect of the way that

15  the indictment is charged.

16    THE COURT:  Yeah.

17    MR. BLACKWELL:  First off, that's not a proper --

18  that's not a valid purpose of a bill of particulars, which the

19  Court's already expressly says it is not -- to provide the

20  United States' legal theories.  But secondly, we're not

21  required to do that because we're allowed to plead.  And the

22  Court brought -- you know, Judge Ezra dealt with the

23  constructive amendment issue and the conjunctive pleading in

24  his order.

25    So I understand what the Court is saying in terms of the

object and -- but if you take a step back, you can still have a
gratuity which is done in exchange for certain actions as a
reward.  The difference is, the bribery has a specific intent
which the gratuity is not going to have.  In some ways gratuity
is actually a lesser included offense of a bribery.  And, in
fact, there's different -- potentially different sentencing
status that -- if you look at the federal gratuity versus
federal bribery, they're sentenced under --

THE COURT:  That's what SunGrower was all about.

MR. BLACKWELL:  That's right.  They're sentenced under
different things.  So I don't necessarily agree with the Court,
respectfully, that the object -- the language "in exchange for"
is dispositive in terms of making us select a certain theory
that the jury could not find.

In fact -- and, Your Honor, I would go a step further.  I
believe that, given the way we've charged this crime being
committed in multiple ways -- and I want to be very clear.  I'm
not saying we have not charged a bribery.  We have.

THE COURT:  Judge found you did.

MR. BLACKWELL:  That's right.  So I don't want to -- I
don't want to be -- I'm not trying to, you know, be cute or tap
dance or be legalistic.  We charged a bribery.  We just also
charged a gratuity, which we are allowed to do.

So it's both in there.  Both of the ways that the statute
can be violated are charged in this indictment.  And we are not

1   required to select because the law clearly says we can plead

2   this way.  We can go forward.  We can submit our proof to the

3   jury.  As long as the jury unanimously agrees that the statute

4   was violated in one of the ways, he'll be found guilty.  And

5   that question will be put to the jury as to, Do you unanimously

6   agree that the statute was done --

7       The statute can be violated in the facts of this case both

8   ways.  It could be both a reward for certain actions and a *quid*

9   *pro quo*.  And let me -- I'm going to do a little *non sequitur*,

10  Judge, just to -- just to clear something up real quick because

11  it tickled my memory.

12          THE COURT:  That's fine.

13          MR. BLACKWELL:  A *quid pro quo* in a bribery, the law

14  does not require that the official taking the action do

15  anything different.  And, in fact, it can be actions that they

16  would have otherwise taken.  It is not -- it is very clearly

17  not a defense to say that, I would not have taken this action

18  but for the bribe.  So I just want to -- I know that's kind of

19  neither here nor there, but that was something that was raised

20  before.

21          THE COURT:  Doesn't have to be but for, but there has

22  to be an influence, right?  I mean, in other words, you might

23  have done the same thing, but it's the corrupting influence --

24          MR. BLACKWELL:  Well, it's a corrupting influence,

25  but --

```
1            THE COURT:  Right.
2            MR. BLACKWELL:  -- it's not that it caused -- it's not
3    that they would have taken --
4            THE COURT:  It doesn't have to cause it.  Yeah.
5            MR. BLACKWELL:  -- that action no matter what.
6            THE COURT:  Yeah.
7            MR. BLACKWELL:  That's not --
8            THE COURT:  Correct.
9            MR. BLACKWELL:  That's not --
10           THE COURT:  I understand.  I understand.
11           MR. BLACKWELL:  I just -- and I guess it's not germane
12   necessarily to this, but it was said --
13           THE COURT:  No.  But I understand what you're saying.
14   Go ahead.
15           MR. BLACKWELL:  -- and I wanted to make sure that that
16   was clear.
17       But, Your Honor, this all comes down to two things they're
18   asking for.  One is discovery.  They want to know, you know,
19   additional overt acts and things like that.  And I think we've
20   dealt with that.
21       But secondly, and probably the most -- the thing this
22   Court's considering and their strongest -- not their strongest
23   argument but the strongest thing they're advocating for, I
24   guess, is they want to know -- they want to lock the
25   United States into a legal theory.  And that's what they want
```

1   to do.  They want to -- they want to lock us into a legal

2   theory.

3       If this indictment did not have the language that says, you

4   know -- if the indictment stopped at "intending to be

5   influenced" and did not have "or rewarded in connection with a

6   transaction," we would be locked in.  There is no question.

7       Conversely, if it did not have the "intending to be

8   influenced" language and just said "to be rewarded in

9   connection," we would be locked in that way.  Okay?  But the

10  indictment does not say that.

11      What has been presented and grand jury's returned tracks

12  the language of the indictment, but it says that this

13  indictment -- violated several ways.  And that's how it's been

14  charged.  And at no time -- we're allowed to present that to

15  the jury, Your Honor.  And a bill of particulars saying which

16  one it is, is an attempt to cut -- to cut one of those two

17  things off.

18          THE COURT:  Well, let me ask you with regard to the

19  discovery question, you noted that a bill of particulars isn't

20  a vehicle for discovery.  However, the providing of discovery

21  can make a bill of particulars inappropriate.

22          MR. BLACKWELL:  Right.

23          THE COURT:  I had asked the defense counsel the

24  question with regard to what exactly were these statements from

25  Judge Galindo that were being relied upon to say, Hey, there's

1  a problem here?  Let me ask you the flip side of that.

2          MR. BLACKWELL:  Sure.

3          THE COURT:  I know you're not required to disclose

4  Jencks material in advance.  Are there some more statements

5  that are going to be coming out to where this will get raised

6  again in a different context, or have you pretty much given the

7  discovery of what you're intending to present at trial, to the

8  extent you can tell.  And you're not required to.  But you see

9  why I'm asking.

10          MR. BLACKWELL:  No, no, no, no, no.  I understand why

11  you're asking, Your Honor.  I have no problems answering that

12  question.  In fact, I've got it number two circled here --

13          THE COURT:  Oh, all right.

14          MR. BLACKWELL:  -- that I meant to -- I meant to

15  address.  We have given Jencks statements.  Now, additional

16  interviews are being done.

17          THE COURT:  Sure.

18          MR. BLACKWELL:  As those interviews are being done,

19  we're preparing --

20          THE COURT:  You're willing to supplement.

21          MR. BLACKWELL:  -- 302s and --

22          THE COURT:  Okay.

23          MR. BLACKWELL:  -- turning those over.

24          THE COURT:  All right.

25          MR. BLACKWELL:  We're sending out some tomorrow for

1    three witness interviews, in fact, that have recently been

2    done.

3              THE COURT:  All right.

4              MR. BLACKWELL:  But in terms of the 302 reports that

5    have been done, those have all been turned over.  That

6    includes -- so early production of Jencks.  As the Court knows,

7    even grand jury information from Agent Giese has -- Mr. Galindo

8    participated in two interviews.  One was recorded.  That has

9    been turned over, the very first one.

10             THE COURT:  Is that transcribed or just a recording?

11             MR. BLACKWELL:  Just a recording.  But a 302 was done

12   as well, so the summary of it.

13             THE COURT:  Okay.  That's fine.  Go ahead.

14             MR. BLACKWELL:  That was the first interview before he

15   was cooperating.  And the second interview was not recorded,

16   but there's a lengthy 302 detailing that.

17             THE COURT:  Got you.

18             MR. BLACKWELL:  We've given over bank records,

19   financial records.  We've given them records from GEO, which

20   was running the prison, basically doing the administrative

21   functions.  We've given records from Bureau of Prisons.  We've

22   given Reeves County records.  We've given records that we

23   obtained from CCH, which is the successor company from PNA,

24   records from the grand jury that have been obtained, records

25   from a search warrant.

1     We've engaged in as close to open file discovery as we're

2   really able to.  We've given -- we've got -- there's a

3   cooperator -- not a cooperator.  That's the wrong word.  That'd

4   be Galindo.  A confidential source who provided some

5   information.  And we've given all those records, including

6   payment records to that confidential source.  We've --

7          THE COURT:  All right.  Are there any additional

8   documents or evidence from Judge Galindo himself that you --

9   that y'all have?  Do you think that you're going to be

10  disclosing at a later time?

11         MR. BLACKWELL:  Not -- we've -- he has given us

12  records.  He's given us his email records, and he's given us

13  documents that he had.  We've disclosed all that.

14         THE COURT:  All right.  The reason I'm asking is the

15  defense is real -- one of their arguments was, Look, what

16  exactly did Galindo do?

17         MR. BLACKWELL:  Right.

18         THE COURT:  Have you given them everything that you

19  know?

20         MR. BLACKWELL:  Everything --

21         THE COURT:  It sounds like you've given them

22  everything you know about that.

23         MR. BLACKWELL:  Everything that Judge -- everything

24  that Mr. Galindo provided to us has been provided to the

25  defense.

1          THE COURT:  All right.  Very well.

2          MR. BLACKWELL:  And then the 302s of his interviews

3     have been provided as well.

4          THE COURT:  Then I had one other question.  But, of

5     course, I'm happy to hear any argument you or Mr. O'Connell

6     would like to make.  But I had a question -- if you'd like to

7     respond to the limitations issue that was raised by the

8     defense, this question of whether -- if Judge Galindo's actions

9     were a long time ago, that -- how is this so -- continuing a

10    conspiracy or how could they defend themselves against -- or

11    prepare a defense to say, Hey, this is outside the statute of

12    limitations?  And I'm happy to hear your response.

13         MR. BLACKWELL:  Well, the -- sure.  First, statute of

14    limitations is an affirmative defense.  We've claimed a

15    conspiracy that has run within the statute of limitations, and

16    provided overt acts that go within the statute of limitations,

17    specifically the payments that relate to, you know, the

18    agreements that were given.

19       So basically -- I mean, it's no secret that the way that

20    the payments were done was through the contract with -- between

21    BOP and PNA.  Well, not -- excuse me.  That's wrong.  I'm

22    sorry -- BOP and Reeves County to run the R-3 detention

23    center --

24         THE COURT:  Yeah.

25         MR. BLACKWELL:  -- was essentially a ten-year

contract. It was -- it was -- there was a term. But then, you
know, several terms after that, a two-year. So essentially a
two-year -- a ten-year contract from 2007, so to run to 2017.

Contemporaneous with that, Carlos Uresti was given a -- you
know, we put in quotes -- "consulting agreement." He was paid
money from PNA. Those payments continued with the successor
companies. And Mr. Uresti then funneled half of that money,
minus a deduction for rent for an office that was never used,
to Mr. Galindo.

Those payments, you know, in exchange for the actions that
were taken, were done well into the statute of limitations. So
the conspiracy continues, like you said, until it ends. And
when you're talking statute of limitations, a defendant has to
show affirmatively that they withdrew from the conspiracy.

So that's something -- I mean, I assume it's something we
could put to the jury. I mean, they're going to probably argue
that he -- I don't know what they're going to argue. But, you
know, it sounds like they may want to try to put that to the
jury. But -- and they raised that with the Court, with
Judge Ezra.

But, you know, the indictment has charged actions within
the scope of the statute of limitations. There were payments
made to Uresti, which turned around and paid -- made the
payments to Galindo. This sounds like an argument for a jury
basically to decide whether those were, in fact, criminal, you

1  know, actions as part of the conspiracy, whether the conspiracy

2  continued or whether it ended at some point.  But it's

3  simply -- you know, it'd be a question for the jury.

4         THE COURT:  All right.  Very well.

5    Anything else?

6         MR. BLACKWELL:  Is that -- unless you have additional

7  questions, Your Honor.

8         THE COURT:  No.  That was -- that was fine.  Thank

9  you.

10    Let me hear from -- it looks like the defense wants to have

11  a brief rebuttal.

12         MR. HUNTER:  Briefly, Your Honor.  Yes.

13         THE COURT:  Yeah.  Sure.

14         MR. HUNTER:  The first thing I just want to emphasize

15  is that while certainly we can't use a bill of particulars to

16  make the government commit to a legal theory, the goal of the

17  bill of particulars is for us to understand what we are charged

18  with in an exact enough way that we can present our defenses.

19    And the big elephant in the room here is that if the

20  government has this ability to use a gratuity as a theory that

21  it can proceed with, it has a diminished burden of proof.  It

22  has to prove a much lesser intent than what they have to

23  accomplish if they're going to prove a bribe.

24    And so what it really boils down to is the statute

25  contemplates both, according to Judge Ezra, according to the

majority of the circuits.  We contest that.  But the reality

is, we have to live in a world where the statute contemplates

both actions being this crime.

That does not mean that one individual act must be both or

can be both at any given particular moment.  In fact, the

intents are somewhat mutually exclusive.  If you were intending

to influence someone and if the same conduct could be both a

bribe or a gratuity in a particular circumstance -- and the

difference is the subjective state of mind of the actor.  And

that's going to be something the jury decides based on the

objective evidence surrounding the event.

If I'm intending to influence someone, I am, by definition,

not going to be rewarding them for an act that I appreciate.  I

don't appreciate them at all.  I want them to be my agent.  I

mean, the Foreign Corrupt Trade Practices Act defines this

corrupt intent to mean essentially that the actor -- the

bribee's will is no longer the bribee's will.  He may be not --

it's not like he's so overborn that he must do it.  But he's

not doing it for any personal motivations of his own thought.

He's doing it because of the briber's intent.  That is mutually

exclusive to the *mens rea* that you would need for a true

gratuity.

THE COURT:  Okay.  I have to press you on that.  It's

an interesting point.  But from the perspective of your client,

I don't see why that would be true.  And the reason is, is it

1  seems to me that you can say from your client's intent, it's --

2  I either want to influence him to do it, or I want to reward

3  him to do it.  And it's the other guy's intent to decide

4  whether it was influencing him or not.

5      If he says, Ah, I didn't even think about that, I just was

6  doing what I was going to do, but I was happy to take the

7  reward, then it plays out of the gratuity.  So, I mean, it

8  seems to me that your client -- your client in this context,

9  Mr. Farthing, that -- the person who's bribing or rewarding

10  could have an intent to do both at the same time.  It just

11  turns out what the responsive intent is, just like in a

12  contract.  Why wouldn't that be the case here?  That's why I --

13  and maybe I'm misunderstanding the law, and I often do.

14          MR. HUNTER:  Well, no, Your Honor.  I don't

15  necessarily agree with the Court's position, but even if the

16  Court was right, this is a 371 conspiracy.

17          THE COURT:  Fair enough.

18          MR. HUNTER:  We have to presume that all three of

19  these actors had a shared intent; that they were all operating

20  under the same purpose and belief.  And if we're assuming that

21  that kind of high mind of criminality exists here, then we need

22  to -- we need to be able to say what the specific intent was,

23  for two reasons, both for the bribery to survive and for what

24  our agreement may be.  We need to know what that intent was.

25      And the decision to reward someone is an affirmation and an

approval of their act.  And it is perhaps a recognition of the fact that there were unspoken influences between the two individuals prior.

Our argument in the motion to dismiss was not solely that the time is the definitive factor.  But I think time is one of the clearest indicators about whether one is something or the other.  But certainly, it is about the overall intention of the parties.  But that difference is mutually exclusive.  But being that it's a conspiracy, I think the specific intent of all actors has to be the same, and it's got to have to be one or the other.

And so the government wants to hang on to this, because despite all of the claims about, We have *quid pro quo*, We have *quid pro quo*, they've got a messy cooperating codefendant with a messy set of stories that he's told over a long period of time.  They are not confident that they're going to get a *quid pro quo*.  They need that gratuity to be in there if they are going to be able to survive.  They have to present it.  They have to tell that story as their first shot because there's way too much about *quid pro quo* in the past for them to ignore. But they need that out.

And why on earth would we say that just because 666 allows for us to have both possible acts as a crime -- why would we say that they are -- they are the same -- they can be charged in the same count?  I mean, that alone is an interesting

question.  Can I both -- can I both bribe and engage in illegal

gratuity on the exact same facts?

THE COURT:  Well, conspiracies can have multiple

illegal objects.  That's always been the case.

MR. HUNTER:  Well, that's certainly true.

THE COURT:  All right.

MR. HUNTER:  But let's posit that it was a substitute

for a moment, and let's say there was no 371.  Would they be

able to present that as -- would that be a duplicitous

indictment or not?

THE COURT:  I see what you're saying.  Yeah.

MR. HUNTER:  I don't -- I think the answer would be

no.  If, in fact, we're going to have a unified theory that

bribes and gratuities are both covered by 666, why on earth

would we allow the jury to convict of both in a single count?

THE COURT:  All right.  Very well.

MR. HUNTER:  Briefly as to the limitations argument,

Your Honor, again, why the payment was made is going to make a

difference in our jury argument about how long the conspiracy

ran.

And just -- let's just take it as this.  We can say that

someone would reward a person for a long term of service as

being very friendly and favorable to their company by perhaps

giving them employment and making that run over a number of

years.  That might sell to a jury.

1    But the idea that a *quid pro quo* on one contract would

2 run -- is an indefinite guarantee of payments is a completely

3 different argument that we would be able to make to this jury.

4 And we need to know, because it's going to affect how we assert

5 that affirmative defense and whether we even can.

6    THE COURT:  All right.

7    MR. HUNTER:  So I'd ask the Court to just consider

8 that.

9    THE COURT:  All right.  Very well.

10    MR. GOLDSTEIN:  Your Honor, I know I can't --

11    THE COURT:  I didn't think you could actually stand

12 it.  I kind of expected eventually, Mr. Goldstein, you would

13 say something.  Then I'll -- if necessary, I'll hear something

14 else from the prosecution.

15    MR. GOLDSTEIN:  Without stepping on government

16 counsel's point, two things that just come to my mind.  One,

17 while I found it interesting -- and I understand that the

18 government could change their theory in the middle of a case,

19 and there would be little we could do about it.  But one of the

20 reasons for Stirone and the bill of particulars is that we

21 ought to at least be entitled to understand what the grand jury

22 indicted our client for.

23    And while I agree with the Court about the moving target

24 with respect to intent, I think the Supreme Court in Elonis --

25 although it was a totally different issue.  It was, I think, a

terroristic threats case.  But they talk about the intent that we need to focus on in the criminal trial is proof beyond a reasonable doubt of the culpable mental state of the party charged.

You know, while it is true that the person could both appreciate a reward or a bribe in advance of that act, it is the intent, that it has to be something that has a corrupt purpose.  And it's Mr. Farthing's intent that is at issue.  And that is what the grand jury has charged.

And I am -- I was intrigued by the Court's focus on paragraph 11 on Page 3 as the object, that at least we ought to get a ruling that that is the object that they have alleged, that the grand jury intended, and that we can rely upon that as being what they are expected and will be required to prove beyond a reasonable doubt, Your Honor.

THE COURT:  All right.  Very well.  Thank you.

(At the bench off the record)

(Open court)

THE COURT:  All right.  I appreciate the parties' presentations.  Extremely interesting.  I'm happy to hear more, Mr. Blackwell, but I think I know where I am, unless there's something you wanted to add.  I see you looking at me.  I don't want to go into a ruling without hearing from you, sir.

MR. BLACKWELL:  It depends on your ruling as to whether I want to add things or not, Your Honor.

1          THE COURT:  That's always the case.

2          MR. GOLDSTEIN:  We'll join in that.

3          MR. BLACKWELL:  I just want to say this in terms of

4    the legal theory, that statutes can be violated multiple ways.

5    And ultimately when they say the government has the luxury of

6    picking which legal theory, I mean, we're allowed to present a

7    series of facts and evidence to the jury and to say, Jury, this

8    is the way these statutes can be violated.

9          And then the jury, as long as they prove beyond -- you

10    know, decide unanimously beyond a reasonable doubt, they get --

11    they can elect which way the statute was picked.  And they want

12    to cut that off and say that -- no, that you're not allowed to

13    do that.  The law specifically allows for this type of pleading

14    through Fifth Circuit precedent.  The Court's already --

15    Judge Ezra's already recognized that we're doing it.  We've

16    been, you know, upfront about how we're doing it.

17          And so the whole basis of what they're trying to do to

18    basically cut off a way that the statute could be violated,

19    that the jury could look at and say, based upon these facts,

20    the statute was violated this way.  As long as they unanimously

21    agree and are charged appropriately, that is -- those improper

22    use for a bill of particulars is not what the bill of

23    particulars is designed to do, but also would be improper and

24    do away with the entire concept of disjunctive pleadings.

25          THE COURT:  All right.

1    MR. BLACKWELL:  That's all I wanted to add.  Thank

2 you.

3    THE COURT:  All right.  Thank you.

4    All right.  Again, as I was saying, extremely interesting

5 issue.  I appreciate the parties' presentations on it.  I think

6 the parties know that I've considered the issue rather

7 carefully in preparation for this hearing and thought about

8 this a little bit.

9    This motion for bill of particulars that's in front of me

10 will be denied as moot in part, denied in part and denied

11 without prejudice in part.  And let me explain exactly what I

12 mean.

13    With regard to the issues addressed by Judge Ezra in his

14 motion to dismiss, it's moot.  He's already resolved those

15 issues.  A very important one of those issues is whether 18 USC

16 666 can be -- includes both a bribery crime and a gratuity

17 crime.  He's resolved that issue for purposes of this trial.  I

18 note for the record the defense objection to that, so it's

19 preserved for future hearings if there are any on that matter.

20    With regard to the question of whether this particular

21 indictment charges a *quid pro quo* sufficient to apprize the

22 defendants of the crime, I believe Judge Ezra has also resolved

23 that in his motion.  And to the extent he hasn't, I find that

24 it's sufficient to do that.

25    With regard to the question of the bill of particulars in

general as to other matters, I'm denying it in part because I
don't believe a bill of particulars is a place to get overt
acts. I think that those can change. And that's -- the
government's entitled to change them. And so for that reason a
bill of particulars is not appropriate on that matter.

I also believe that the government has engaged in -- has
provided sufficient discovery in this case to protect against
any surprise at trial as to the facts that will be presented at
trial.

Why is it denied in part without prejudice? It's denied
without prejudice to a unanimity jury instruction request, as
mentioned by the government. But it's also denied without
prejudice to two other arguments that I see. And I want to be
clear about what my view is. Though, the parties are going to
have to resolve this with Judge Ezra.

I read the object of that conspiracy as a *quid pro quo*. It
doesn't say that he's going to get payments as a result of
official action. It says he's getting payments in exchange for
favorable action. "In exchange for" -- that's my
understanding. I'm just making the record. And other people
might see it otherwise. That's what *quid pro quo* means. So
that sounds to me like a bribery claim.

And to the extent that this is a gratuity -- evidence is
presented to the jury, the government has the right to do this,
and seeks a unanimity theory, it may be that the defense will

1   seek a motion to dismiss because the indictment's been

2   constructively amended.

3       I know that Judge has somewhat addressed that in his order.

4   But I reread the order this morning.  I see him saying it can

5   charge either a gratuity or a bribery, and it has charged a

6   bribery.  I don't read in this opinion that he says it has

7   charged the gratuity claim.  That's what I read.  So I think

8   that issue is still out there for the judge to decide.

9       Also, I believe that this matter may be appropriate to

10  address at the pretrial conference by way of a motion in limine

11  one more time so that the judge is fully apprized of what this

12  problem's going to be at trial if the government goes ahead and

13  seeks to put a gratuity case before the jury.  That could be a

14  motion in limine allowing gratuity evidence in the absence of

15  bribery claims, or a motion in limine trying to exclude that

16  evidence.  So to that extent the motion is denied without

17  prejudice.

18      So that's the Court's ruling.  It's going to be a very

19  short written ruling.  I hope that that oral ruling is clear

20  enough for the parties.  And I'm happy to clarify if anyone has

21  a question.  Of course I'll start with the government.

22          MR. BLACKWELL:  No, Your Honor.

23          THE COURT:  All right.  Any question as to the Court's

24  ruling from the defense?

25          MR. HUNTER:  No, Your Honor.

1      THE COURT: All right. Very well.

2      Now if we could turn to two matters. One is this question

3 about the jury selection in the case. I have -- Mr. Watts, if

4 you'd come forward so I can hear from you, I'd appreciate it.

5 I understand that the parties have consented to me doing the

6 jury selection. And that's great. Happy to do it. I don't

7 know how many jurors we're going to get for the selection yet.

8 I think the courtroom deputy for Judge Ezra is working on that

9 right now.

10     I understand that a questionnaire, a little bit more

11 extensive than the normal questionnaire, has already been sent

12 out to the jury panel for that day. It's my intent to allow

13 the parties to have those jury questionnaires once the panel

14 appears because some people may not appear for court, and that

15 sometimes happens. So you'll have them that morning before you

16 have to -- have jury selection.

17     It's my intention to allow the parties to engage in

18 attorney voir dire, which I know other judges sometimes don't

19 do, but I always do. I believe that particularly defense but

20 also the government has a right to talk to the jurors before

21 they decide who's going to decide their case.

22     My general rule is to -- is 20 minutes per side for that.

23 But, of course, with two defendants, I give both defendants 20

24 minutes. I will hear any objection from the government. If

25 they want some more time, I'm happy to consider it. And if the

defense wishes more time than 20 minutes per defendant, I'm
happy to consider that as well.  But that's my general rule.

My experience has been that after an hour of attorney voir
dire, there's not anything else to find out about the jury.
Instead, there's a danger that the jury will be influenced by
the voir dire, which is not what it's for.  That's my general
rule, but I will happily hear any arguments the parties would
like to make.

One other matter I wanted to mention, and then I want to
hear from the parties.  I have had demonstrative exhibits or
PowerPoints presented to the jury during -- the prospective
jury for voir dire.  Those things are going to need to be
disclosed to the Court and to the other side by the time of the
pretrial conference.  I've had a couple of times where things
were disclosed at trial, one time a PowerPoint that didn't
work, one time cartoon pictures of the defendant as a criminal.
I really don't want things like that.  I want to know in
advance what we have, so if there are any issues, we can have
all of that decided before the panel is brought in.

Last thing I should mention, many attorneys like to ask
questions on a scale of one to ten.  I don't allow it.  And the
reason I don't allow those sorts of questions to the
prospective jurors is I find it tends to confuse them more than
to elucidate what their views are.

So those are my general views.  With that in mind, let me

1    hear from all the parties as -- if there's anything they wanted

2    to know or by way of clarification.  Of course, I'll start with

3    the government.

4         MR. BLACKWELL:  I have been through voir dire fairly

5    recently with you, Your Honor, as you know.  And so I don't --

6    I don't think I have any questions.  We would just, you know,

7    continue to urge that questions that go on the scale of

8    advocacy not be allowed.  That's the crux of the United States'

9    concern.

10        But that's -- other than that, Your Honor, if --

11             THE COURT:  Of course.

12             MR. BLACKWELL:  Twenty minutes should be fine.  But,

13   you know, as you know, sometimes questionnaires -- and if

14   there's a need for more time, we'll probably raise it the day

15   of based upon answers or based upon a questionnaire --

16             THE COURT:  And I'm happy --

17             MR. BLACKWELL:  -- or something like that.  So --

18   yeah.

19             THE COURT:  -- always happy to consider that, sir, of

20   course.

21             MR. BLACKWELL:  So that's -- you know, issues that

22   come up -- but otherwise, Your Honor, we don't A) have any

23   objection to you conducting jury selection, obviously.

24             THE COURT:  All right.

25             MR. BLACKWELL:  And we don't have any questions at

1 this time.

2       THE COURT:  All right.  Very well.

3    Mr. Watts, happy to hear from you, sir.

4       MR. WATTS:  Yes, sir.  I'm trying to remember what

5 happened last time.  And I think -- because I couldn't be

6 there, I didn't sit in and see how long it took.  But I recall

7 being told that basically your goal was, we need this jury

8 seated in one day.  And I think that's an admirable goal, and

9 we like that.

10    But we would ask for leave -- for 45 minutes a side.  This

11 is a case with substantial pretrial publicity, particularly

12 with the previous case.  It's going to take a while to get

13 through those issues.  I can assure the Court that in the last

14 30 years of practicing law, I've never done a voir dire where I

15 didn't start it by saying, It's now 11:00, and the bad news is

16 you have to answer questions from me.  The good news is I'll

17 sit down by 12:00, and promise them, first point, it's going to

18 be 45 minutes.

19    But I think in this particular case, given, you know, the

20 continued presence of my friend from the San Antonio

21 Express-News back there, which is fine, the bottom line is,

22 there's a lot to go through in terms of juror attitudes.  And I

23 don't think you can do that in an appreciable manner in 20

24 minutes.  I think 45 would be sufficient.  We would humbly ask

25 the Court for that, with the commitment that nobody in here

1 wants a situation where we're expending more than a day of the

2 Court's time to select this jury.

3       THE COURT:  All right.  Well, that's denied without

4 prejudice at this time.  But I will reconsider it.  I'm going

5 to see exactly what the -- questionnaires come back and exactly

6 what the publicity looks like at that time.

7       MR. WATTS:  Sure.

8       THE COURT:  Sometimes that can affect the Court.  And

9 I will be happy to hear from the parties at that time.

10       MR. WATTS:  Thank you.

11       THE COURT:  I'm going to try to make the decision at

12 that time.

13   Mr. Goldstein, anything on this issue on behalf of

14 Mr. Farthing?

15       MR. GOLDSTEIN:  Briefly, Your Honor.  We concur and

16 will abide by the Court's, I think, very reasonable rules.  And

17 I also appreciate the Court's understanding -- you've tried a

18 lot of cases -- of the desire by counsel to engage in attorney

19 voir dire.  And we would join in the request for 45 minutes.

20       THE COURT:  Sure.  Noted.

21       MR. GOLDSTEIN:  With regard to questionnaires, would

22 it be possible for us to see the questionnaire in advance, with

23 an eye towards we may want to submit a questionnaire and ask

24 the Court for leave to do that of our own, depending on what

25 the questionnaire is that the Court plans.  And I --

1          THE COURT:  I am pretty sure I can get you guys a copy

2     of the blank questionnaire so you can see what has been asked.

3          MR. GOLDSTEIN:  Thank you.

4          THE COURT:  I will tell you I expect that the judge

5     is not -- Judge Ezra will not allow any additional

6     questionnaire, having been down this road with him twice in

7     recent year -- in recent months.  But at least that would

8     apprize you of what -- to know what's in there so that you can

9     then present your proposed questions as to things that follow

10    from that or things that maybe aren't covered.

11        And, oh, I forgot to mention, Mr. Goldstein -- thank you

12    for reminding me -- what I plan to do is, right before I bring

13    the panel in, I will go through all the proposed voir dire of

14    all the parties and say, I'm asking these.  You guys can ask

15    these.  And you can't ask -- no one's asking these, so that

16    everybody knows exactly what we're asking.  It addresses this

17    question of advocacy that Mr. Blackwell raised.  But it also

18    gets you to know exactly what things I'm going to cover and

19    what things y'all may need to cover.

20        After I've gone through all of those, that may be a point

21    at which you want to ask for more time or may need to in light

22    of the questions that I ask you to ask.  Do you understand,

23    Mr. Goldstein?

24          MR. GOLDSTEIN:  I do, Your Honor.

25          THE COURT:  Mr. Watts, I see you standing up.

1          MR. WATTS:  Just one other thing.

2          THE COURT:  Yeah.

3          MR. WATTS:  It may be a significant timesaver.  If the

4     Court has the questionnaires back by Friday before the --

5          THE COURT:  I don't -- I think --

6          MR. WATTS:  And I'm not talking about giving them out.

7     I'm talking about getting access, so that you've got --

8          THE COURT:  I'll find out.

9          MR. WATTS:  We can do a lot of honing of voir dire by

10    having a couple of hours with the questionnaires three days

11    before we do it.  And I certainly understand --

12         THE COURT:  I don't know exactly how they get --

13         MR. WATTS:  -- the point of not making photocopies --

14         THE COURT:  Well, and I don't know exactly how they

15    get back to us.  I'll find out.

16         MR. WATTS:  Okay.  Very good.  Thank you.

17         MR. GOLDSTEIN:  Lastly, Your Honor, in terms of time,

18    given the amount of publicity this case and individuals have

19    received, it may be that we're going to be asking the Court for

20    individual voir dire of certain members outside of the hearing

21    and presence of the others in order not to contaminate the

22    remaining jurors.  And I would -- my experience is that in

23    cases like this there may be instances where we're going to --

24    I wanted to at least alert the Court that we'll be asking --

25         THE COURT:  I should mention what my practice is with

regard to that, is I'll ask my questions.  I'll then ask the
parties to come up to see if there's any additional questions
they want me to ask, before then I allow them to ask questions.
I then usually will excuse the jury and see if we need to do
some additional individual voir dire up here with the attorneys
or so forth before we're finishing off and start making
strikes.  So I'm going to give you the opportunity to seek that
on either side if that's necessary.

MR. GOLDSTEIN:  Thank you.

MR. BLACKWELL:  And, Your Honor, I'm sorry.

THE COURT:  Yes, Mr. Blackwell.

MR. BLACKWELL:  Just one more thing.

THE COURT:  Sure.  No.  That's why I wanted to talk
about -- while we're all here.

MR. BLACKWELL:  The lawyer saying the saying, just one
more thing.  But as I recall, you give a certain amount of
strikes to the government, and you give a certain amount of
strikes to the defense, and each side gets their own strikes.

THE COURT:  Yeah.

MR. BLACKWELL:  We'd ask, and I think consistent with
your prior practice, that they not be allowed to kind of merge
their strikes and collaborate with them.

THE COURT:  Correct.

MR. BLACKWELL:  And if there are any jury consultants
that might be employed, that those jury consultants work with

1  whatever side employs them and not, you know, ferry information
2  back and forth so that, you know, they're not basically merging
3  all their strikes together to -- you know, to work them
4  together.
5       THE COURT:  Right.  Yeah.  My general practice is to
6  give both defendants equal number of strikes as the government.
7  That's more than is required by the rule.  But you'll have to
8  exercise your strikes independently.  The reason I do that is
9  there sometimes can be a situation where the defendants, at the
10  beginning of evidence at trial, might be pointing the finger at
11  each other.  And that's why I think y'all are each entitled to
12  your own strikes as to who you think the jury should be.  But
13  there shouldn't be collaboration about that.  That's my general
14  view.  But I give you more for that reason.
15     Anything further, Mr. Blackwell?
16       MR. BLACKWELL:  Not on this matter.  There's one other
17  matter.  We ask that --
18       THE COURT:  Oh, that's right.  Y'all needed to --
19  okay.  Let me find out about this, and then I'll come back.
20       MR. BLACKWELL:  And then we'd ask to be allowed to
21  approach on that matter.
22       THE COURT:  Oh, sure.  Of course.  Anything further as
23  to the jury selection, Mr. Goldstein?
24       MR. GOLDSTEIN:  Nothing further, Your Honor.
25     With respect to pointing fingers, we anticipate that

1  there'll only be one [inaudible].

2      THE COURT:  Okay.  All right.  Very good.

3      Mr. Watts, anything further on the jury selection issue,

4  sir?

5      MR. WATTS:  Not on the jury selection.

6      THE COURT:  All right.  Very well.

7      Now, you needed to approach as to another matter.  And is

8  it all three?

9      MR. BLACKWELL:  All three, probably.  It wouldn't

10  hurt.

11      THE COURT:  Okay.

12      (At the bench)

13      MR. BLACKWELL:  Thank you, Your Honor.  I don't

14  believe it impacts Mr. Watts' client, but it doesn't hurt him

15  being here.

16      MR. WATTS:  [Inaudible].

17      THE COURT:  I think it's on the record.  It's just not

18  --

19      MR. WATTS:  [Inaudible].

20      THE COURT:  Right.

21      MR. BLACKWELL:  Mr. Harris was counsel in this case,

22  and he's removed himself.  We put kind of a Chinese wall, for

23  want of a better word.

24      THE COURT:  I saw that.

25      MR. BLACKWELL:  We don't discuss the case with him.

1 He's not involved. And the reason that is, is Mr. Harris'

2 daughter was recently married. And, generously, Mr. Goldstein

3 allowed them to use his house for the -- I think it was a week

4 ago or whatever it was.

5        MR. GOLDSTEIN: A week ago Saturday, Your Honor.

6        THE COURT: [Inaudible].

7        MR. GOLDSTEIN: [Inaudible] -- you would have been

8 very proud.

9        MR. BLACKWELL: I wasn't invited.

10        THE COURT: If I had done it, then I could recuse

11 myself. But go ahead.

12        MR. BLACKWELL: But it was determined, because of

13 that, that it would be best, for appearances reasons and things

14 like that, that Mr. Harris go off the case.

15        THE COURT: Sure. All right.

16        MR. BLACKWELL: We've been given some -- the

17 recommendation has been, just because of that, that

18 Mr. Farthing kind of be apprized of -- and I've spoken with --

19        MR. GOLDSTEIN: I have no objection.

20        MR. BLACKWELL: -- Mr. Goldstein and Ms. Orr about

21 this, that Mr. Farthing be apprized of his right to

22 conflict-free counsel --

23        THE COURT: Sure.

24        MR. BLACKWELL: -- and understand the conflict and

25 agree to waive it, just to clear up the record. I don't

1   necessarily believe there's a conflict, but that's what's been

2   advised.  And I've discussed it with Mr. Goldstein --

3           MR. GOLDSTEIN:  He has.

4           MR. BLACKWELL:  -- and Ms. Orr, and they think it's

5   probably just a good idea to clean it up.

6           THE COURT:  All right.  Do you want -- do you want me

7   to do it here at the bench, or do you want me to clear it and

8   do it another time without everybody here?  However you want to

9   is fine.  I'm going to leave it up to you, sir.

10      (Discussion off the record)

11      (At the bench)

12          THE COURT:  The attorneys just raised a little issue

13  for me that I wanted to address and make sure you understood.

14  There was a prosecutor on this case before, Bill Harris.  And

15  Mr. Harris was in the case, but his daughter got --

16  Mr. Goldstein allowed his house to be used for his daughter's

17  wedding.  And because of that, there's like a connection

18  between Mr. Goldstein and Mr. Harris.

19      Mr. Harris isn't on the case anymore, but you might be

20  concerned that, you know, maybe Mr. Goldstein has a conflict if

21  he's friends with Mr. Harris and Mr. Harris actually had his

22  kid married at his house.  Has Mr. Goldstein told you about

23  this situation?

24          DEFENDANT FARTHING:  Yes.

25          THE COURT:  All right.  In light of this situation, do

1  you wish to go forward with Mr. Goldstein at this time, or
2  would you prefer to have a different attorney?
3          DEFENDANT FARTHING:  I would like to go with
4  Mr. Goldstein.
5          THE COURT:  All right.  You understand that you're
6  entitled to have an attorney that is completely free of any
7  conflict, even a conflict like being friends with the
8  government, that -- in any way that might influence them?  You
9  understand you have that right?
10         DEFENDANT FARTHING:  Yes, sir.
11         THE COURT:  All right.  Very well.
12     Knowing that right, you want to go forward with
13  Mr. Goldstein at this time?
14         DEFENDANT FARTHING:  Yes, sir.
15         THE COURT:  All right.  Very well.
16     Mr. Blackwell, anything further?
17         MR. BLACKWELL:  No, sir.  Thank you.
18         THE COURT:  All right.  Thank you, sir.  We'll have
19  that on the record.
20         MR. BLACKWELL:  Thank you.
21     (At the bench off the record)
22     (Open court)
23         THE COURT:  All right.  I think that takes care of the
24  matter at the bench.  But is there any other matter that we
25  needed to put on the record or any other concerns,

1   Mr. Blackwell?

2           MR. BLACKWELL:  Nothing else.  We appreciate it, Your

3   Honor.

4           THE COURT:  All right.  Mr. Watts, anything further at

5   this time, sir?

6           MR. WATTS:  Would now be the time to bring up a small

7   discovery issue?  You mentioned it, and I just --

8           THE COURT:  About to say, I'm not -- I don't have it

9   before me.  I mean, you can -- if you want to put it on the

10  record or maybe address it with Mr. Blackwell and then see if

11  there needs to be a motion.

12          MR. WATTS:  I'll do that.  Okay.

13          THE COURT:  All right.  Very well.

14     Mr. Goldstein, anything further at this time?

15          MR. GOLDSTEIN:  Nothing further, Your Honor.  Thank

16  you.

17          THE COURT:  All right.  That concludes this hearing.

18  We'll be in recess.

19  * * *

20     (Hearing adjourned at 11:07 a.m.)

21

22

23

24

25

-oOo-

I certify that the foregoing is a correct transcript from the electronic sound recording of the proceedings in the above-entitled matter.


Date:  9/13/2018      /s/ Chris Poage
                      655 East Cesar E. Chavez Blvd., Suite G-65
                      San Antonio, TX  78206
                      Telephone:  (210) 244-5036